**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI,
WESTERN DIVISION**

RUDOLPH WALKER                                          PLAINTIFF


VERSUS                          CIVIL ACTION NO. 5:06cv60-DCB-JMR

THE CITY OF VICKSBURG, MISSISSIPPI;
CHIEF TOMMY MOFFETT; DEPUTY CHIEF
RICHARD O'BANNON; MAYOR LAURENCE
LEYENS; ALDERMAN MICHAEL MAYFIELD;
ALDERMAN SIDNEY BEAUMAN; AND
JOHN DOES 1-10                                         DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter comes before the Court on the defendants' Motion for Summary Judgment **[docket entry no. 27]**.  Having reviewed the Motion, memoranda, applicable statutory and case law, and being otherwise fully advised as to the premises, the Court finds and orders as follows:

**I. FACTS**

The plaintiff Rudolph Walker has worked in the field of law enforcement since 1976, including several stints with the City of Vicksburg, Mississippi Police Department ("VPD").  In 1998, the plaintiff was hired as a patrol officer with VPD.  In addition to this full-time position, Walker went to work part-time as a constable for Warren County, Mississippi in 2002.

Walker was diagnosed with non-insulin dependent diabetes roughly seventeen years ago.  Aided by medication, the plaintiff was able to perform his duties as a VPD patrol officer adequately,

including frequent staffing of the "C-shift" which ran from 11:00 p.m. to 7:00 a.m.  In November 2004, the plaintiff was assigned to work the C-shift on a permanent basis.

Beginning in February 2005, Walker began experiencing episodes of dizziness, lapses in memory, and drowsiness.  In March 2005, the plaintiff began to have tingling sensations in his arms.  On April 1, 2005, Walker consulted his physician, Dr. Joseph Wilson.  Dr. Wilson determined that the plaintiff's fasting blood sugar level was 379 — an elevated amount — and prescribed a new medication (Micronase (Glyburide)) to regulate Walker's "Diabetes mellitus, type II, out of control."  (Pl.'s 4/1/05 Med. Record.)  Dr. Wilson also ordered the plaintiff to refrain from work until a follow-up visit on April 4, 2005, and noted his intention to "dictate a letter stating that he should have regular hours so that he can more closely monitor his glucose and diet."  (Pl.'s 4/1/05 Med. Record.)  Upon Walker's return to Dr. Wilson on April 4, his fasting blood sugar level had fallen to 178 and his condition was styled as "Diabetes mellitus better controlled."  (Pl.'s 4/4/05 Med. Record.)  Dr. Wilson also wrote a letter on the plaintiff's behalf which the plaintiff delivered to Deputy Chief Richard O'Bannon on April 5.  The letter read, in relevant part:

> [Rudolph Walker] suffers from medical conditions that are best managed by having him work regular shifts.  Particularly, he should have a more regular shift between 7 in the morning and 3-5 in the afternoon.  It is advisable that he eat meals on a regular basis

> and take his medications according to the
> directions.
>
> I recommend that Mr. Walker be placed on a
> shift more closely resembling at [sic] 7-3 or
> 8-5 shift.

(4/4/05 Letter from Dr. Wilson.)  The plaintiff claims that he told

Deputy Chief O'Bannon about the particular problems he was having,

including blackout episodes, on April 5 and April 7.  (Walker Depo.

83.)

On April 6, 2005, Lamar Horton, Human Resource Director for

the City of Vicksburg, sent a letter to Dr. Wilson acknowledging

the City's receipt of Dr. Wilson's letter of April 4 and posing the

following four queries:

> a. What difference does it make in Officer
> Walker having a regular shift of 11:00 p.m. to
> 7:00 a.m.?  Officer Walker is still able to
> eat as he would on any shift.  If he has to
> eat more often than normal, then we can
> accommodate him.
> b. How does the taking of medication affect
> Officer Walker on the 11:00 p.m. to 7:00 a.m.
> shift?  Officer Walker is able to stop and
> take medication as prescribed during his
> shift.
> c.  Based upon your review of Officer Walker
> and the fact that you state you have been his
> physician for a number of years, is Officer
> Walker, in your opinion, able to perform the
> duties and responsibilities of a police
> officer as generally performed within the
> market?
> d. Would the fact that Officer Walker also
> works a second job as a constable have any
> impact on him being able to perform two (2)
> jobs on a daily basis?  In short, would
> Officer Walker's medical condition improve
> upon him only having to perform one job?

(4/6/05 Letter from Lamar Horton.)   Also enclosed with this correspondence was a medical release form that Lamar Horton requested Dr. Wilson complete.  Dr. Wilson responded to the City's questions and returned the completed medical release form on April 13, 2005.  In his reply, Dr. Wilson made the following remarks:

> a. Due to hormonal variations in the normal human being, officer Walker's medications are designed to be taken with a normal daily routine and staying up from 11:00 pm to 7:00 am would adversely affect his hormonal biorhythm; therefore, I recommend that he have a more normal sleep-work cycle.
> b. Working 11:00 pm to 7:00 am would have no effect on officer Walker taking his medications but would alter their effect due to normal hormonal variations, otherwise known as diurnal variation of hormones.
> c. If officer Walker is allowed to perform his duties as I have specified, working days and sleeping at night, I would have no problem maintaining his health in a fashion that will make him able to perform his duties with no difficulty.
> d. As long as officer Walker is able to sleep from approximately 10:00 pm to 6:00 am daily, he should have no problem functioning at whatever level of work schedule he chooses.

(4/13/05 Letter from Dr. Wilson.)   On the medical release form provided by the City, Dr. Wilson concluded that the plaintiff was "physically able to perform the duties of a Police Officer." (4/13/05 Med. Release Form.)

Walker returned to work on the C-shift on or about April 11, 2005.  On May 3 and 19, 2005, the plaintiff went to Dr. Wilson for follow-up visits, wherein no new symptoms were reported and his condition was deemed to be stable.  (Pl.'s 5/3/05 Med. Record;

4

Pl.'s 5/19/05 Med. Record.)

At some point in May 2005, Walker told a city employee that on several occasions he had blacked out while driving his patrol car. After learning of the blackouts, Chief Tommy Moffett sent the plaintiff a letter dated May 25, 2005 in which he told Walker that he was to be "immediately temporarily transferred" to an office job with working hours from 12:00 p.m. to 9:00 p.m.  (5/25/05 Letter from Chief Moffett.)  Chief Moffett also instructed the plaintiff that

> [t]o allow you to continue to perform as a patrol officer, we must have confirmation from your physician that you are no longer having 'black out spells.'
>
> You must provide me with a statement from your doctor on or before 5:00 p.m., Wednesday, June 1, 2005.  If we do not receive a statement from your doctor by the above stated date and time, we will have no choice but to place you on leave without pay.

(5/25/05 Letter from Chief Moffett.)  When Walker did not obtain the requested statement by the June 1 deadline, Deputy Chief O'Bannon notified him by letter dated June 2, 2005 that the Vicksburg Board of Mayor and Aldermen had approved VPD's request that Walker be placed on leave without pay pending the receipt of the same.[1]  (6/2/05 Letter from Deputy Chief O'Bannon.)  Deputy

---

[1] The corresponding Personnel Action Form indicates that the City of Vicksburg did not approve the suspension until June 10, 2005.  This minor discrepancy is immaterial to the matter before the Court.

Chief O'Bannon warned that if Walker "continue[d] to fail to provide the Police Department with the requested information, the Police Department will review this matter to make a determination as to your employment status with the Police Department." (6/2/05 Letter from Deputy Chief O'Bannon.)  O'Bannon also suggested that Walker check into the availability of Family Medical Leave should his physician determine that his medical condition prevented him from carrying out his duties.  (6/2/05 Letter from Deputy Chief O'Bannon.)[2]

When the plaintiff returned to Dr. Wilson on June 13, 2005, his condition was found to be stable.  (Pl.'s 6/13/05 Med. Record.) Dr. Wilson also noted that

> [Walker] is most concerned today about getting forms filled out for family leave.  He has been in a dispute with the City over his work schedule.  It is my opinion that it would be better from a medical standpoint if he had a more normal work schedule.  His diabetes has been previously poorly controlled when he was on night shift.

(Pl.'s 6/13/05 Med. Record.)  Two days later on June 15, 2005, Lamar Horton sent Dr. Wilson a letter wherein he inquired

> if Officer Walker is fit to carry out the required duties of a police officer.  The City of Vicksburg is certainly willing to work with Officer Walker, but we are concerned about public safety as well as the safety of Officer Walker.  Your help is needed to establish: (a)

---

[2] By letter dated June 28, 2005, the City of Vicksburg informed Walker that he had been placed on family medical leave retroactive to June 2, 2005.

if a shift change would be helpful as it
pertains to Officer Walker's 'blackout
spells;' (b) are the 'blackout spells'
controllable? Please specifically state, in
your opinion, under what conditions Officer
Walker will be able to perform his duties. If
these 'blackout spells' can be controlled or
eliminated, will it be necessary for Officer
Walker to take time off from work to bring
this condition under control?

(6/15/05 Letter from Lamar Horton.)  Dr. Wilson responded to this

letter on June 23, 2005 when he wrote the following:

Mr. Rudolph Walker suffers from diabetes
mellitus type II. This condition is difficult
to control if he is not on a regular schedule,
working the usual daily hours between
approximately 6:00 a.m. and 6:00 p.m. daily.
Any significant change in his sleep cycle will
result in changes in his hormonal variations
throughout the day and make the treatment of
his diabetes mellitus more difficult.

He has had high glucoses in the past during
night shifts during alterations in his diet
schedule. This condition is a chronic
condition and had been treated at the
Vicksburg Clinic for at least five years. It
is expected that he will have diabetes
mellitus type II for the duration of his life.
This condition will probably necessitate
intermittent time off from work due to acute
illnesses which may make his glucose more
difficult to control; however, during periods
of good control, he should be able to maintain
a full-time daily schedule. These
intermittent episodes of time off cannot be
predicted.

Mr. Walker's health will not prevent him from
working as a full-time police officer;
however, appropriate accommodations should be
made for his work schedule to insure that he
is able to eat regular meals of the
appropriate constituents to maintain good
glucose control.

7

(6/23/05 Letter from Dr. Wilson.)

The City of Vicksburg then referred the plaintiff to Dr. William C. Nicholas for an examination.  Dr. Nicholas concluded that no correlation existed between Walker's diabetes and the drowsiness and other problems he had while on night shift work. (8/31/05 Letter from Dr. Nicholas 3.)  Dr. Wilson wrote another letter on September 13, 2005, wherein he essentially reiterated his earlier opinions and stated that "it would be safest for Mr. Walker and best for his medical care if he had a routine work schedule that allowed him to be awake during the daytime hours and sleep during the normal nighttime hours."  (09/13/05 Letter from Dr. Wilson.)

The plaintiff eventually returned to his patrol officer position with VPD, working the C-shift at first and later the B-shift (3:00 p.m. - 11:00 p.m.).  In January 2006, Walker was involved in an automobile accident while on duty and henceforth has been unable to return to work.[3]

## II. PROCEDURAL HISTORY

On April 7, 2006, the plaintiff commenced an action in this Court against the City of Vicksburg, Mississippi, Chief Tommy Moffett, Deputy Chief Richard O'Bannon, Mayor Laurence Leyens,

---

[3] In April 2007, approximately a year after this lawsuit was filed, Walker was terminated from his employment with the City of Vicksburg.  The reasons behind such termination are unknown and are not relevant to the matter now before the Court.

8

Alderman Michael Mayfield, Alderman Sidney Beauman, and John Does 1-10.  (Compl. 1.)  In his complaint, Walker sought relief under the Americans with Disabilities Act of 1990, 104 Stat. 328, 42 U.S.C. § 12101 et seq. ("ADA"), alleging that the defendants failed to make reasonable accommodations for his disability and suspended him from his job in violation of the Act.  (Compl. ¶¶ 27-34.)  The plaintiff also brought a state-law claim against the defendants for intentional infliction of emotional distress.  (Compl. ¶¶ 35-42.) Following discovery, the defendants filed their Motion for Summary Judgment  [docket entry no. 27].  That Motion is now before the Court.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is apposite "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue

---

[4]  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate Partnership v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (internal citations omitted).

of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the nonmoving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252.  The nonmovant must instead come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Summary judgment is properly rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### IV. ANALYSIS

The basic thrust of the defendants' Motion is that the plaintiff has failed to establish that he suffered from a

"disability" as contemplated by the ADA; therefore, Walker was not entitled to a reasonable accommodation. (Defs.' Mot. Summ. J. ¶ 2.) Accordingly, so goes the argument, the defendants are entitled to a judgment as a matter of law given the absence of any genuine issue of material fact. The plaintiff responds that he has presented ample evidence which shows that he was disabled under the ADA because of his diabetes and thus was entitled to a reasonable accommodation. (Pl.'s Resp. Defs.' Mot. Summ. J. ¶¶ 2-4.) Walker also contends that genuine issues of material fact exist which bar the grant of summary judgment in the defendants' favor. (Pl.'s Resp. Defs.' Mot. Summ. J. ¶ 4.) Consequently, the central issue for determination is whether at the times pertinent to this dispute the plaintiff had a disability pursuant to the terms of the ADA.[5] The resolution of this issue will be dispositive of the Motion now before the Court.

*A. ADA Discrimination Claim*

1. Applicable Law

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the

---

[5] According to the United States Court of Appeals for the Fifth Circuit, "an impairment must be substantially limiting at the time of the requested accommodation." Burch v. Coca-Cola Co., 119 F.3d 305, 315 (5th Cir. 1997). According to the plaintiff, on at least three occasions — April 4, 2005, April 13, 2005, and June 23, 2005 — were requests for a reasonable accommodation made on his behalf. (Pl.'s Memo. Opp. Defs.' Mot. Summ. J. 11-12.)

hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions, and
privileges of employment." 42 U.S.C. § 12112(a) (2006). The word
"discriminate" encompasses, inter alia, "not making reasonable
accommodations to the known physical or mental limitations of an
otherwise qualified individual with a disability who is an
applicant or employee, unless such covered entity can demonstrate
that the accommodation would impose an undue hardship on the
operation of the business of such covered entity[.]" Id. at §
12112(b)(5)(A).

"'As a threshold requirement in an ADA claim, the plaintiff
must, of course, establish that he has a disability.'" Waldrip v.
Gen. Elec. Co., 325 F.3d 652, 654 (5th Cir. 2003) (quoting Rogers
v. Int'l Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir. 1996)).
"The term 'disability' means, with respect to an individual (A) a
physical or mental impairment that substantially limits one or more
of the major life activities of such individual; (B) a record of
such an impairment; or (C) being regarded as having such an
impairment." Id. at § 12102(2)(A–C). The Supreme Court of the
United States instructs that "guidance for interpreting the terms
of [the ADA definition of disability]" should be taken from the
pre-existing regulations interpreting the Rehabilitation Act of
1973, 87 Stat. 361, 29 U.S.C. § 706(8)(B), issued by the Department
of Health, Education, and Welfare ("HEW"). Toyota Motor Mfg.,

Kentucky, Inc. v. Williams, 534 U.S. 184, 193-94 (2002).

The pertinent regulations provide as follows regarding the meaning of "a physical or mental impairment:"

> (I) Physical or mental impairment means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine[.]

45 C.F.R. § 84.3(j)(2)(I) (2006).[6]

"'Substantially' in the phrase 'substantially limits' suggests

---

[6] The Equal Employment Opportunity Commission ("EEOC") has also promulgated regulations which provide as follows:

> (h) Physical or mental impairment means:
> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.]

29 C.F.R. § 1630.2(h)(1) (2006). The United States Court of Appeals for the Fifth Circuit has stated that these regulations "provide significant guidance," Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726 (5th Cir. 1995); however, the Fifth Circuit has more recently acknowledged that later decisions of the Supreme Court "strongly suggest that the regulations are not entitled to [Chevron] deference" and therefore may merely be persuasive authority. Waldrip v. Gen. Elec. Co., 325 F.3d 652, 655 n.1 (5th Cir. 2003). Therefore, this Court only takes notice of the fact that the EEOC regulation defining "physical or mental impairment" reads verbatim with the HEW regulation defining the same terms under the Rehabilitation Act of 1973.

'considerable' or 'to a large degree.'  The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of [major life activities] from qualifying as disabilities." <u>Toyota Motor Mfg.</u>, 534 U.S. at 196-97 (internal citations omitted).  "'Major' in the phrase 'major life activities' means important.  'Major life activities' thus refers to those activities that are of central importance to daily life." <u>Id.</u> at 197.  Therefore, "to be substantially limited [in a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.  The impairment's impact must also be permanent or long term." <u>Id.</u> at 198.  It is not enough for a person asserting he is disabled "to merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" <u>Id.</u> (quoting <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 567 (1999)).

In addition, the determination of whether a person labors under a disability requires an individualized assessment. <u>Id.</u>; <u>Albertson's, Inc.</u>, 527 U.S. at 566; <u>Sutton v. United Air Lines</u>, 527 U.S. 471, 483 (1999); <u>Bragdon v. Abbott</u>, 524 U.S. 624, 641-42 (1998); <u>Kapche v. City of San Antonio</u>, 304 F.3d 493, 497 (5th Cir.

14

2002).  Such a case-by-case inquiry is especially appropriate when "the impairment is one whose symptoms vary widely from person to person."  Toyota Motor Mfg., 534 U.S. at 199.  The effects of corrective or mitigating measures taken by a person with an impairment must also be considered when ascertaining whether that person is substantially limited in a major life activity and therefore disabled under the ADA.[7]  Sutton, 527 U.S. at 482; Kapche, 304 F.3d at 497.

2. Application of Law

The plaintiff contends only that he actually had "a physical of mental impairment that substantially limit[ed] one or more of [his] major life activities . . . ."  42 U.S.C. § 12102(2)(A); see Pl.'s Memo. Opp. Defs.' Mot. Summ. J. 18-23.  Nowhere in his

_____

[7] The Supreme Court eschews an analysis which disregards corrective measures and categorizes persons according to their diagnosed impairments rather than the actual effects of such impairments.

> For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities.  A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes.
> . . .
>
> This is contrary to both the letter and the spirit of the ADA.

Sutton, 527 U.S. at 483-84.

filings does Walker argue or present sufficient proof that he had a "record of such impairment" or was "regarded as having such an impairment."   Therefore, the Court's analysis will be chiefly focused upon the first definition of disability under the ADA as found at 42 U.S.C. § 12102(2)(A).

      a. Actual Impairment Substantially Limiting
      Major Life Activities

The Court's consideration of subsection (A) involves three queries: (1) whether the plaintiff's diabetes mellitus type II is a physical impairment; (2) whether the life activities on which the plaintiff relies are major life activities, and; (3) assuming the first two questions are in the affirmative, whether the plaintiff's diabetes mellitus type II substantially limited one of his major life activities.  Bragdon v. Abbott, 524 U.S. 624, 631 (1998).

      i. *Physical Impairment*

There is no doubt that the plaintiff's non-insulin dependent diabetes mellitus type II qualifies as a physical impairment under the ADA (as informed by 45 C.F.R. § 84.3(j)(2)(I) and 29 C.F.R. § 1630.2(h)(1)), given that such disease is a physiological disorder or condition affecting the digestive, hemic, and/or endocrine systems, inter alia.  Fraser v. Goodale, 342 F.3d 1032, 1038 (9th Cir. 2003); Harewood v. Beth Israel Med. Ctr., 2003 WL 21373279, *5 (S.D.N.Y. June 13, 2003) (unpublished opinion); Bonitch v. Original Honey Baked Ham Co. of the East, Inc., 34 F. Supp. 2d 154, 158 (E.D.N.Y. 1999).

ii. *Major Life Activities*

Walker asserts that his diabetes mellitus type II impairment
"substantially limited him in the major life activities of eating,
thinking, and caring for himself." (Pl.'s Memo. Opp. Defs.' Mot.
Summ. J. 18.)  The Fifth Circuit has held that eating is a major
life activity, Waldrip v. Gen. Elec. Co., 325 F.3d 652, 655 (5th
Cir. 2003), and has acknowledged that the EEOC guidelines recognize
caring for oneself as a major life activity.  Mason v. United Air
Lines, Inc., 274 F.3d 314, 317 (5th Cir. 2001).  While the Fifth
Circuit has not yet recognized thinking as a major life activity,
several other Circuit Courts of Appeals have done so.  Taylor v.
Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999); E.E.O.C.
v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001); Nawrot v. CPC
Int'l, 277 F.3d 896, 903 (7th Cir. 2002); Battle v. United Parcel
Serv., Inc., 438 F.3d 856, 861 (8th Cir. 2006); Head v. Glacier
Nw., Inc., 413 F.3d 1053, 1061 (9th Cir. 2005); Smoke v. Wal-Mart
Stores, Inc., 208 F.3d 227 (table) (10th Cir. 2000) (unpublished
opinion); but see Hill v. Metro. Gov't of Nashville, 54 Fed. Appx.
199, 201 (6th Cir. 2002) (unpublished opinion).  The Court will
proceed under the presumption that thinking constitutes a major
life activity under the ADA.

iii. *Substantial Limitation*

The plaintiff posits that he is substantially limited in the
major life activity of eating because "he must exercise constant

vigilance with regard to his diet to manage his diabetes or he will suffer serious health consequences," "[he] must take extreme care with what, when, and how much he eats[,] and because he "is limited in the quantity and choice of what he eats . . . ." (Pl.'s Memo. Opp. Defs.' Mot. Summ. J. 20.)

It may be true that Walker must monitor the time and amount of his meals more closely than the average person; however, the plaintiff has not demonstrated that the requirements that he eat at certain times or in particular portions are of sufficient moment to qualify as substantial limitations on the major life activity of eating.

The plaintiff likewise has not shown that his diabetes mellitus type II is of such a nature so as to significantly circumscribe the types of food he may consume. Merely because Walker must watch and limit what he eats more closely than a member of the general population does not mean that he is disabled under the ADA. To so hold would be to recognize all persons with diabetes, lactose intolerance, food allergies, and various other eating-related impairments as disabled. "[N]either the Supreme Court nor [the Fifth Circuit] has recognized the concept of a per se disability under the ADA, no matter how serious the impairment; the plaintiff must still adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." Waldrip, 325 F.3d at 656.

The Court is of the opinion that the plaintiff has not shown that his eating habits were restricted "to a large degree" or in a "considerable' way.  <u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184, 196-97 (2002).  Thus the Court finds that Walker has failed to come forward with enough evidence to demonstrate that his particular impairment substantially limited his major life activity of eating.[8]  Accordingly, the defendants are entitled to a judgment as a matter of law on this issue.

The plaintiff next urges that his diabetes substantially limited his ability to care for himself.  Specifically, Walker points out that he "suffered dizziness and 'blackouts' while on duty."  (Pl.'s Memo. Opp. Defs.' Mot. Summ. J. 21.)  At his deposition, Walker said that, beginning in mid-February 2005 while working the C-shift, these symptoms were associated with him ending up in places without knowing how he got there while driving his patrol car.  (Walker Depo. 66, 80.)  Certainly the major life activity of caring for onself includes the ability to operate a car without blacking out, given that a person's safety may be at risk.  However, according to Walker, his periods of incapacity were confined to his work on the C-shift and did not encroach upon any

---

[8] The Court does not find the cases upon which Walker relies to be persuasive, insofar as they all involved persons with insulin dependent diabetes whose erratic blood sugar fluctuations required ultra vigilance and a demanding intake regimen.  In this case, the plaintiff does not have insulin dependent diabetes and has not shown that his blood sugar levels are similarly irregular and in need of an analogous level of exacting attention.

other area of his life:

> Q: Okay.  Besides limiting you and that you
> could not work the night shift for the police
> department, was your diabetes limiting you in
> any other way?
> A: None that I can recall, ma'am.
> Q: Okay.  So you were able to do everything
> else that you could do before you started
> working the night shift except for working the
> night shift; is that right?
> A: Yes, ma'am.
> Q: Okay.  So the only way that your diabetes
> limited you was with regard to the night
> shift?
> A: Yes, ma'am.

(Walker Depo. 72-73.)

Nevertheless, the Court is of the opinion that dizziness and blackouts while on the C-shift could alone rise to the requisite level of substantial limitation because of their apparently severe effects upon the plaintiff.  Thus the Court finds that Walker has borne his burden of going forward by presenting enough evidence for a jury to find that his diabetes mellitus type II impairment substantially limited the major life activity of caring for himself.  Consequently, summary judgment shall not follow for the defendants on this issue.

Lastly, the plaintiff asserts that his diabetes substantially limited him in the presumed major life activity of thinking. Again, Walker points to the bouts of dizziness and blacking out which he experienced while working the C-shift.  While the plaintiff does not assert that his thinking was impaired at any other time than during the C-shift, the Court finds that, due to

the significant dizziness and blackout spells, the plaintiff has come forward with sufficient evidence for a jury to find that he was substantially limited in the major life activity of thinking. Summary judgment is therefore inappropriate for the defendants on this basis.

   b. Record of Impairment Substantially Limiting
   Major Life Activities

   The Fifth Circuit instructs that "in order to make out a claim for discrimination based on a record of impairment, the plaintiff must show that at some point in the past, [he] was classified or misclassified as having a mental or physical impairment that substantially limits a major life activity." Sherrod v. American Airlines, Inc., 132 F.3d 1112, 1120–21 (5th Cir. 1998).  The Court finds the record to be devoid of any argument or evidence presented by the plaintiff which would indicate that he had a prior history of a diabetes mellitus type II impairment which substantially limited him in a major life activity.

   c. Regarded As Having Impairment Substantially Limiting
   Major Life Activities

   "Under the ADA . . ., an individual who is not in fact disabled may have a viable claim that he was 'regarded as' disabled if the employer mistakenly believes that: (1) the individual has a physical impairment that is substantially limiting; or (2) an actual, but not-limiting impairment is substantially limiting." Pegram v. Honeywell, Inc., 361 F.3d 272, 287 (5th Cir. 2004).  In

21

order to prevail, the plaintiff must show the employer believes the employee either "'has a substantially limiting impairment that [he] does not have or that [the employee] has a substantially limiting impairment when, in fact, the impairment is not so limiting.'" Id. (quoting <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 489 (1999)).

Here, the first prong does not apply because Walker did indeed have an impairment.  As to the second prong, the Court is of the opinion that the plaintiff has completely failed to demonstrate that the defendants regarded his impairment as substantially limiting in a major life activity.

3. Holding

For all of the above reasons, the Court finds that the plaintiff has failed to make a showing sufficient to establish that his diabetes mellitus type II actually substantially limited him in the major life activity of eating.  Walker has likewise failed to argue or present sufficient evidence that he had a record of an impairment which substantially limited a major life activity or that he was regarded by the defendants as having such an impairment.  The defendants are entitled to a judgment as a matter of law on these bases.

However, the Court does find that the plaintiff has shown that a genuine issue of material fact exists as to whether he was substantially limited in the major life activities of caring for

22

himself and thinking by his diabetes mellitus type II. Consequently, summary judgment is inappropriate in favor of the defendants on these issues.

The Court is also cognizant that additional bases for summary judgment may exist in this case other than the ones urged by the Motion before the Court; accordingly, free leave is given to the parties to hereafter present such motions to the Court.

### V. CONCLUSION AND ORDER

All matters before the Court having been addressed, accordingly:

**IT IS HEREBY ORDERED** that the defendants' Motion for Summary Judgment **[docket entry no. 27]** is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED,** this the   31st   day of   October  , 2007.


                                         s/ David Bramlette
                                    UNITED STATES DISTRICT JUDGE

23